*This opinion is subject to administrative correction before final disposition.*

# United States Navy–Marine Corps
# Court of Criminal Appeals

_____

Before
GASTON, HOUTZ, and MYERS
Appellate Military Judges

_____

**UNITED STATES**
*Appellee*

**v.**

**Aldriche M. RAMENTO**
Aviation Boatswain's Mate (Aircraft Handling) Second Class
(E-5), U.S. Navy
*Appellant*

**No. 202000285**

_____

Decided: 16 May 2022

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judge:
Kimberly J. Kelly

Sentence adjudged 2 October 2020 by a general court-martial convened at Naval Base Kitsap-Bremerton, Washington, consisting of officer and enlisted members. Sentence in the Entry of Judgment: reduction to E-1, confinement for one year and six months, forfeiture of $1,733 pay per month for 18 months, and a dishonorable discharge.

For Appellant:
*Lieutenant Commander Daniel O. Moore, JAGC, USN*

For Appellee:
*Lieutenant Megan E. Martino, JAGC, USN*

_____

**This opinion does not serve as binding precedent, but
may be cited as persuasive authority under
NMCCA Rule of Appellate Procedure 30.2.**

_____

PER CURIAM:

A general court-martial composed of officer and enlisted members found Appellant guilty of six specifications of violating Article 120, Uniform Code of Military Justice [UCMJ].[1] On grounds of unreasonable multiplication of charges, the military judge conditionally dismissed three of the specifications alleging non-consensual sexual acts and contact [Specifications 2, 4, and 6], pending appellate review of the other three [Specifications 1, 3, and 5] alleging Appellant committed sexual acts and contact upon the victim when she was asleep. Appellant asserts the evidence is legally and factually insufficient to support his convictions. We find no prejudicial error and affirm.

## I. BACKGROUND

In February 2019, several hours away from their duty station and after a day of hiking, Logistics Specialist Second Class (E-5) [LS2] India,[2] Aviation Boatswain's Mate (Handling) Second Class (E-5) [ABH2] Alpha, and Appellant stayed overnight in a hotel room. The room had two beds which they pushed together so as to make it less awkward for the three of them to share the beds.[3] After drinking alcohol, playing games, and talking, sometime around midnight the three went to bed with LS2 India lying between Appellant and ABH2 Alpha, who had headphones on his head that remained on him all night. While in bed, Appellant and LS2 India talked about prior relationships for a while

_____

[1] 10 U.S.C. § 920.

[2] All names in this opinion, other than those of Appellant, the judges, and counsel, are pseudonyms.

[3] The three, along with LS2 India's wife and another friend, went on this trip to commemorate Appellant's impending move across the country. Trips like this were not uncommon for this group, nor was it uncommon for them to share a bed strictly for the purpose of sleeping.

until LS2 India told Appellant goodnight and went to sleep. LS2 India was intoxicated, but remembered the evening, including telling Appellant goodnight.

LS2 India was awakened the next morning by Appellant's attempts to pull her sweatpants and underwear up from her ankles and to cover her with the bed sheet. She then recognized that her pants and underwear had been partially removed and that her sweatshirt was pushed up. Her breasts and nipples hurt as if someone had been squeezing or sucking them, her vagina felt dry, the labia area had a stinging feeling, and after going to the bathroom she noticed that it "smell[ed] like rubber."[4] She later noticed a hickey on the side of her neck.

LS2 India initially attempted to conceal what had happened from her wife, but ultimately confided in her. Over the course of several weeks, via telephone calls and messaging applications, LS2 India and her wife separately confronted Appellant, eliciting from him that he was "catching feelings" for LS2 India on the night of the assault and that he tried to "cuddle" her while she was sleeping. He was apologetic and admitted touching her breasts, sucking her nipples, rubbing her buttocks, and putting his fingers in her vagina. He admitted trying to put his penis inside her, but "didn't know if it went in because he said that when he tried putting it in, he wasn't hard enough."[5] He admitted there was a used condom on the floor the next morning that had "weight from it" when he tried to kick it under a chair or bed.[6] During a subsequent call recorded with the assistance of law enforcement, Appellant acknowledged his prior admissions to LS2 India, confirmed that he had touched her while she was sleeping, apologized repeatedly, and admitted, "I don't know, maybe I was like—I did came [sic]—if I ever did" into the condom.[7]

## II. DISCUSSION

In separate assignments of error, Appellant asserts that the evidence is legally and factually insufficient to support his three convictions under Article 120, UCMJ. We review legal and factual sufficiency de novo.[8]

---

[4] R. at 342.

[5] R. at 350

[6] R. at 351.

[7] Pros. Ex. 5.

[8] Article 66(d), UCMJ; *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002).

In determining legal sufficiency, we must ask ourselves if, "considering the evidence in the light most favorable to the prosecution, a reasonable fact-finder could have found all the essential elements beyond a reasonable doubt."[9] In doing so, we "draw every reasonable inference from the evidence of record in favor of the prosecution."[10] "[T]he standard for legal sufficiency involves a very low threshold to sustain a conviction."[11]

In determining factual sufficiency, we must be convinced of an appellant's guilt beyond a reasonable doubt after weighing the evidence in the record of trial and making allowances for not having observed the witnesses.[12] We do not presume either innocence or guilt, and instead take "a fresh, impartial look at the evidence" to independently determine whether each element has been satisfied with proof beyond a reasonable doubt.[13] Proof beyond a "[r]easonable doubt, however, does not mean the evidence must be free from conflict."[14]

In order to sustain Appellant's convictions for sexual assault as charged in Specifications 1 and 3, the Government must have proven beyond a reasonable doubt: (1) that Appellant penetrated LS2 India's vulva, however slightly, by his penis and his finger; and (2) that he did so when he knew or reasonably should have known that she was asleep. In order to sustain his conviction for abusive sexual contact as charged in Specification 5, the Government must have proven beyond a reasonable doubt: (1) that Appellant touched, directly and through the clothing, the breasts and buttocks of LS2 India; (2) that he did so when he knew or reasonably should have known that she was asleep; and (3) that he did so with an intent to arouse or gratify his sexual desires.

Appellant argues that his convictions are legally and factually insufficient because Appellant and LS2 India conversed about sexual partners while in bed and she "indicated she was awake and communicating during the alleged sexual assault."[15] These arguments ignore the evidence presented at trial, which

---

[9] *United States v. Turner*, 25 M.J. 324, 324-25 (C.M.A. 1987) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

[10] *United States v. Gutierrez*, 74 M.J. 61, 65 (C.A.A.F. 2015).

[11] *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019).

[12] *Turner*, 25 M.J. at 325.

[13] *Washington*, 57 M.J. at 399.

[14] *United States v. Rankin,* 63 M.J. 552, 557 (N-M. Ct. Crim. App. 2006).

[15] Appellant's Br. at 2.

indicates the sexual acts and contact of which Appellant was convicted occurred sometime after Appellant and LS2 India conversed, after she told Appellant goodnight, and after she fell asleep.

There is no evidence of touching, consensual or otherwise, between Appellant and LS2 India, who were only friends at the time, prior to LS2 India telling Appellant goodnight. LS2 India recalled waking in the morning to a darkened room, observing morning light through the curtains as Appellant was covering her up with a bed sheet and trying to put her sweatpants on, which were pulled down and only around one ankle. Her breasts hurt, as did her labia, clitoris and vulva. When the opportunity presented itself, she went to the bathroom to investigate, rubbed her vaginal area with her underwear, and found that it smelled like rubber. Moreover, the other sailor present, ABH2 Alpha, testified that at some point in the early morning on the day in question, he awoke to see the silhouette of one person's body over another in the other bed. He had a general concern about what he had observed so when he was alone with Appellant later in the morning, he asked, "what was that last night?" but Appellant walked away.[16]

Appellant made numerous admissions via telephone calls and messages with LS2 India after the group left the hotel, including that while she slept, he touched her breasts and buttocks, digitally penetrated her, and attempted to insert his penis into her vagina although he "wasn't hard enough."[17] During a law enforcement oral-wire intercept between Appellant and LS2 India, he admitted that he "caught feelings" for LS2 India, went in for a cuddle, and "maybe" digitally penetrated her and "maybe" tried to put his penis in her.[18] He also admitted multiple times to finding a condom on the floor the next morning that had weight to it which was "maybe" his, "maybe" from his wallet.[19] In response to a question from LS2 India regarding how long his fingers were inside her, he stated, "I have no idea."[20] Near the end of the conversation, Appellant broke down crying and apologized repeatedly for what he had done. When combined with the evidence of vaginal pain felt by LS2 India, her awakening to Appellant attempting to pull up her sweatpants, a condom on the floor that had weight, ABH2 Alpha's observation of one person over another, and

---

[16] R. at 494.

[17] R. at 350.

[18] Pros. Ex. 5

[19] R. at 351–52; Pros. Ex. 5.

[20] Pros. Ex. 5

the smell of rubber in LS2 India's underwear, these admissions sufficiently support his convictions for Specifications 1, 3, and 5 of the Charge.

There is also ample evidence that Appellant committed this conduct when he knew or reasonably should have known LS2 India was asleep. LS2 India's testimony convinces this Court that she had no knowledge of Appellant's actions that night, and that she was asleep during his assaults. When she awoke, she recognized that her sweatshirt was raised, and her sweatpants and underwear were down around one ankle. Her breasts felt sore, as if they had been squeezed. When she asked Appellant about this, he admitted that he touched her breasts and buttocks.[21] When she asked him directly, "did you touch me while I'm [sic] sleeping?" he answered, "Yes, I'm so sorry."[22] This evidence is further supported by Appellant's statements admitting that he was "catching feelings" for LS2 India and "went in for a cuddle,"[23] which provides insight into his intent to arouse and gratify his sexual desires. Appellant's claim that LS2 India was awake and consenting to the sexual encounter is simply not supported by the evidence.

Appellant argues that this case is similar to *United States v. Gilpin*,[24] in which this Court overturned a sexual assault conviction because the evidence was insufficient to prove the alleged victim was asleep and otherwise unaware while being penetrated by Appellant. In the present case, however, both the circumstantial evidence and Appellant's admissions clearly demonstrate that LS2 India was asleep at the time of the assaults. If this Court has any doubt, it is whether Appellant penetrated LS2 India's vulva with his penis, but this doubt is overcome by the fact that there was a condom with weight to it on the floor the next morning, that Appellant stated that he "came" into it, that LS2 India smelled the scent of rubber in her underwear, that ABH2 Alpha observed one person over another in the bed in the early morning, and that LS2 India woke up feeling pain in her vaginal area. Appellant's subsequent claims that he only attempted to penetrate her but was unable to do so are not persuasive, and appear to be an attempt to minimize his actions in an effort to avert consequences for committing a very serious crime.

Considering the evidence in the light most favorable to the Prosecution, we find a reasonable fact finder could have found all the essential elements beyond

---

[21] R. at 350–51.

[22] Pros. Ex. 5

[23] Pros. Ex. 5

[24] *United States v. Gilpin,* No. 201900033, 2019 CCA LEXIS 515 (N-M Ct. Crim. App. Dec. 30, 2019).

a reasonable doubt. After weighing the evidence and making allowances for not having observed the witnesses and recognizing that the evidence need not be free from conflict, we, too, are convinced of Appellant's guilt beyond a reasonable doubt.

## III. CONCLUSION

After careful consideration of the record and briefs of appellate counsel, we have determined that the findings and sentence are correct in law and fact and that no error materially prejudicial to Appellant's substantial rights occurred.[25]

The findings and sentence are **AFFIRMED**.

FOR THE COURT:

RODGER A. DREW, JR.
Clerk of Court

---

[25] Articles 59 & 66, UCMJ.